Before the jury was empaneled the prisoner submitted a motion for a continuance based on an affidavit to the effect that he had not had time to prepare his case, and that he could not safely go on trial on account of the absence of certain witnesses, viz: Lee Hunter and Baxter Brown and Calvin Reid, and others not named; that some of these witnesses had been subpoenaed and others had not, and that he expected to prove by these witnesses that the most damaging statements of the State's witnesses were false. During the discussion of this motion the statement was made that the three witnesses above named all lived near the town of Matthews, situated on the Carolina Central Railroad, 12 miles from Charlotte, and could be brought to court by the next morning. The court refused the motion to continue the case. Prisoner excepted. The court then ordered instanter subpoena to be placed in the hands of an officer, and gave instructions that the officer proceed immediately to the vicinity of Matthews, or elsewhere, if necessary, and find all of the absent witnesses of the prisoner and have them in court by next morning. The prisoner was arraigned on Wednesday forenoon of the Special Term which was held on the first Monday in April, and this cause was set for trial on Monday of the second week in April, which was a regular term. When court opened on Tuesday morning the officer made (885) his return, and the witnesses above named were all in the courtroom before the State had begun the examination of the State's witnesses, and prisoner was not deprived of the benefit of the testimony of any of his witnesses.
The State put on the stand the following witnesses:
A. C. Shields testified: "I am 69 years of age. Live in two-storied house with two rooms on each story. One of the rooms on the first story is occupied as a bedroom, while the other is a parlor. There is also a dining-room and kitchen attached to the house. The entrance from the dining-room to the main body of the house would be through the dining-room door, which opens on the piazza, and then through the back door of the house, which also opens on the piazza." That the parlor is on the opposite side of the passage from his bedroom, and that there is a small room, off this parlor, which also has a door opening on the piazza on the rear side of the house. That the witness went to bed about half past 8 o'clock on the night of 8 January, and about 12 o'clock at night he was awakened by the screams of his daughter who, together with her mother, was sleeping upstairs. The witness heard, almost simultaneously with his daughter, two pistol shots and a noise like something had fallen. Witness hallooed out, "What is the matter up there?" and then started to pick up the poker, and a man in the room said, "Stand back!" and *Page 556 
immediately the man fired a pistol shot, and quickly fired a second shot, and the bullet struck the witness on the right breast and passed through and came out on the other side of his breast, and then passed through his left arm, and then the man fired a third pistol shot and then jumped out of the window onto the piazza and escaped. That when witness retired this window was down, but when he was awakened by the screams (886) and when the man in question jumped through his window it was raised. The front door and the back door of the house were both locked, and all the windows downstairs were down when he went to bed. Some one had entered the dining-room on the same night and had eaten some honey and some articles of food, and a pistol and a watch were stolen that night out of his bureau drawer. When the witness hallooed and gave the alarm his son, Lemley Shields, came to his house in a few minutes, and he unlocked the back door to let him in. State's witness M. W. Vance came in 10 or 15 minutes, and witness unlocked the front door to let him in. The witness testified that he had been acquainted with Monroe Johnston, the prisoner, for 12 years, and he swore most positively that the prisoner is the man who shot him in his house on the night of 8 January last, as described by him; that he saw the prisoner by the flash of the pistol, and saw something like a white handkerchief around his neck, and he knew the prisoner by his voice when he said, "Stand back!" He is certain that the prisoner is the man. Witness asked State's witness Vance if he knew whether Monroe Johnston had been released from the chain-gang; that if he had been released then he was the man. By prosecuting attorney: "Where are your wife and daughter, and why are they not attending court?" Objected to by prisoner as irrelevant and tending to prejudice his case before the jury. Allowed by the court, and defendant excepted. Witness answered that his wife and daughter were both at home and sick, and unable to attend court, and had been sick ever since the occurrence."
The other testimony is fully rehearsed in the charge of his Honor, JudgeMeares.
The court granted all the prayers for instructions offered by the (887) prisoner, and then instructed the jury that the crime of burglary was constituted or made up of certain constituent elements, and that it was incumbent upon the State to establish the coexistence of all of these elements. "In the first place, the crime can only be committed in a man's castle or dwelling-house. A dwelling-house is one in which one or more persons habitually sleep. In the next place, the crime of burglary can only be committed in the nighttime. When it is so dark in the evening that a man's features cannot be distinguished, it is considered by the law to be nighttime; and when it is so light in the morning that a man's features can be distinguished, the night has ceased, and it is *Page 557 
daytime. In the next place, there must be a breaking and entry. No great amount of force need be used to constitute a breaking. Where a door is unlocked and merely closed and bolted, and one places his hand upon the knob of the door and turns the bolt and enters, although very slight force is required in turning the bolt, it constitutes a breaking. So, where the sash of a window is down, and there is no fastening above the sash, and one lifts or raises the sash, it constitutes a case of breaking. And where wooden blinds are used, and the blinds are secured by a latch, and the blinds are closed and latched, and one lifts the latch with his finger and opens the blinds and enters, it is a case of breaking. In the next place, the breaking and entry must be made with a felonious intent, that is to say, with the intent to commit some one of the several felonies known to the laws of this State. The State's witness, A. C. Shields, has testified that the alleged burglary was committed in a dwelling-house in which he and his wife and daughter resided at the time. The same witness also testified that the alleged burglary was committed about 12 o'clock on the night in question. The same witness has (888) also testified that the front and back doors of the house were locked, and the window sashes of all the windows were down when he went to bed, which was about 8:30 o'clock. And his son, Lemley Shields, testified that when he heard the alarm he ran over to his father's house and his father, A. C. Shields, unlocked the back door of the house, which opens on the piazza, to let him in, and also that he found that the door of the little room adjoining the parlor, which opens on the piazza, was locked. And State's witness Vance testified that he reached the house in a short time after the firing, and that A. C. Shields unlocked the front door to let him in. And the witness A. C. Shields also testified that, when he was waked up by the firing of a pistol and the screaming of his daughter upstairs, he immediately sprang out of bed, and then discovered that the sash of one of the windows of his bedroom, which opened on the piazza, was raised up, and that this window sash was down when he went to bed. This is the substance of the testimony relied on to show that the house in question is a dwelling-house, and that the crime of burglary was committed in the nighttime, and that the doors of the house had all been locked, and the window sashes had all been let down, and that the breaking and entry was made at the window in the bedroom of A. C. Shields, which, he testifies, was raised and open when he was aroused from his sleep. The bill of indictment in this case contains two counts. The first count charges that the breaking and entry was made by the prisoner with the intent to commit the crime of larceny, which is a felony. The witness A. C. Shields testified that some one had stolen his watch and pistol, which were kept in a bureau drawer in his bedroom on that night. The other count charges that the breaking and entry *Page 558 
(889) was made by the prisoner with the felonious intent to commit the crime of murder. The witness A. C. Shields testified that the prisoner fired three pistol shots at him, and that on the second shot the bullet struck him in the right breast and came out at the left breast and passed through his arm. The State also introduced Dr. Craven, who testified that he examined the wound, and described the wound. It is incumbent upon the prosecution to satisfy the jury beyond a reasonable doubt that the breaking and entry was done with the intent to commit a felony, but it is not incumbent upon the prosecution to show that a felony was actually committed. The crime of burglary has been graded by the law of our State into burglary in the first and second degrees. Burglary in the first degree is committed when one or more of the occupants of the house are actually present in the house at the time that the burglary is committed. In this case the State charges the prisoner with the commission of the crime of burglary in the first degree, and alleges that the witness A. C. Shields and his wife and daughter were actually present in the house at the time that the alleged burglary was committed. The State's witness A. C. Shields testified that at the time of the alleged burglary he and his wife and daughter were occupying the house; that he was sleeping in a room on the first floor, and his wife and daughter were sleeping in a room upstairs. If the jury should be satisfied beyond a reasonable doubt that the crime of burglary in the first degree was committed in the house of A. C. Shields, and at the time alleged, by some one, then a highly important question arises in this case, and that is, are you satisfied beyond a reasonable doubt, from the testimony in the case, that the prisoner, Monroe Johnston, is the man who committed the burglary, as charged by the State? The prisoner has set up the defense of (890) an alibi; that is to say, that at the time the State charges the burglary was committed in the house of Shields the prisoner was sleeping in the house of Harriet Mills, which is about 16 miles distant from the house of Shields, and that, therefore, it was impossible for him to have committed the crime. When this defense is set up by a defendant it is incumbent upon him to satisfy the jury of the truthfulness of the defense; and if the jury are satisfied of the truthfulness of this defense in this case, of course the prisoner is entitled to an acquittal, and if the jury should not be satisfied of the truthfulness of this defense in this case it is incumbent upon the State to satisfy the jury, beyond a reasonable doubt from other testimony in the case, that the prisoner is the man who committed the burglary as charged in the bill," etc. The court recapitulated all of the testimony of the case, and called the attention of the jury to the testimony offered by the prisoner to establish his defense of an alibi. The court said to the jury that "the prisoner has sworn that on the night of the alleged burglary (8 January last) he stayed all *Page 559 
night at the house of Harriet Mills, in the vicinity of Matthews." The prosecution has denied the truthfulness of this statement of the prisoner, and assailed it upon the ground that he is an interested witness, and has argued that he ought not to be believed for this reason. It is true that when a defendant charged with a crime on his trial takes the witness stand and testifies in his own behalf, the law does pronounce him to be an interested witness. A cloud of suspicion, as it were, rests upon his statements, owing to the fact that he is interested. His testimony does not stand upon that high and unsuspicious level or plane where it would stand were he not interested. The law, therefore, requires the jury to weigh and criticize and consider such testimony with great caution and care and deliberation. The law, however, does not go so far as to say that a jury must not believe an interested witness. On the (891) contrary, an interested witness can tell the truth, and if the jury believe the statements of an interested witness to be true, then they must act accordingly. The statements of an interested witness, if believed by the jury to be true, are entitled to the same weight as they would be were he a disinterested witness. The prisoner also offered Harriet Mills as a witness, and she testified, as he did, that the prisoner stayed all night, being Wednesday night, the night of the alleged burglary, at her house, in the vicinity of Matthews. The prosecution assailed the general character of this witness, and argued that her statements ought not to be believed by the jury, while the prisoner, on the other hand, asserts that her statements are true. The prosecution introduced three witnesses who testified that the general character of Harriet Mills is bad. A question of veracity is entirely within the province of the jury. It is for the jury, and not the court, to pass upon the credibility to be attached to the statements of the witness. Prisoner also introduced the colored boy, Robert Mills, son of Harriet, about 11 years old, as a witness, and he testified, in substance, as his mother did, and also that his mother had told him what to say as a witness on this trial. The prisoner also introduced the witnesses Reid and Brown, and Hunter and others, who testified in substance, that the prisoner was in the neighborhood of Matthews and of Harriet Mills's house on Monday and Tuesday and Thursday and Friday of the week in question. It is charged, and you will remember, that the burglary was committed on Wednesday night, 8 January. Calvin Reid testified that the prisoner was at his house Monday evening and on Tuesday, and he told him to come back, and he did come back, on Thursday. The witness lives eight miles east of Charlotte, and four miles from Matthews. Hunter testified that the prisoner came to his house about 10 or 11 o'clock on Thursday and picked cotton for (892) the balance of the day, and also picked cotton for him on Friday, and Smith testified that he saw the prisoner going to Hunter's about 8 *Page 560 
o'clock on Thursday, 9 January, to pick cotton. The prisoner testified that he picked cotton for Baxter Brown on Wednesday all day. The witness Baxter Brown testified that the prisoner did pick cotton for him a portion of one day during the week in question but he did not remember which day it was. This testimony on the part of the prisoner, as to his picking cotton at the places mentioned and as to his whereabouts for several days before and several days after the night of 8 January, was offered to corroborate and strengthen his testimony, and that of Harriet Mills and Robert Mills, viz., that he stayed all night on the night of 8 January, when it is charged that he committed the burglary at A. C. Shields on that night. The testimony offered to show that the prisoner is the man who committed the burglary in question is that of the witness A. C. Shields who testified that he has known the prisoner for more than 12 years; that the prisoner fired at him in his bedroom three times; that he recognized the features of the prisoner and saw his beard, and also a white cloth around his neck, by the flash of the pistol; that he was familiar with the prisoner's voice; that it was a low, soft voice, and when the prisoner said to him, `Stand back!' he recognized his voice. He swore positively to the identity of the prisoner. The testimony of Stewart, the mail carrier, was that he saw a man, before sunrise on Thursday morning, on the Statesville road, walking very fast, about four miles from Charlotte. He had a white cloth or towel around his (893) neck, and he thought the man was the prisoner. He was acquainted with the prisoner but he would not swear positively that the man was the prisoner. Winders saw prisoner on 27 December, and he was wearing a white towel around his neck. Pucket testified that he overtook a negro man wearing a brown coat, before sunrise on the morning of 9 January, on the Statesville road, going toward Charlotte, about four miles from Charlotte, and met Stewart (mail carrier) about the same time. Hunter and Allison testified that the prisoner was at Hunter's store at Derita after 9 o'clock on Monday night, 6 January, about six miles from the house of A. C. Shields. The object of the State in offering the testimony of Stewart and Pucket and Hunter and Allison and Finger was to show that the prisoner was at Hunter's store on Monday night, the 6th, and not at the house of Harriet Mills, and that between daylight and sunrise on the morning of the 9th he was on the Statesville road going toward Charlotte. When the testimony is contradictory in any respect, and cannot be reconciled, it is the duty of the jury to sift the truth from the testimony to the best of their ability. If the jury is satisfied, beyond a reasonable doubt, that the prisoner is guilty, they ought to convict him; but if they are not satisfied beyond a reasonable doubt of his guilt, they ought to acquit him." *Page 561 
The defendant excepted to the charge of his Honor, and assigned the following grounds as error therein: (1) For that the judge failed to instruct the jury in accordance with the act of Assembly (Laws 1889, p. 418, ch. 434, "that when the crime charged in the bill of indictment is burglary in the first degree, the jury may render a verdict in the second degree if they deem it proper to do so." (2) For that the judge charged the jury that there were two counts in the bill of indictment in this case — the one charging that the breaking and entry was done (894) with a felonious intent to commit the crime of larceny, and the other one charging a felonious intent to commit the crime of murder; meaning thereby to charge and in fact charging that the bill of indictment contains two counts for burglary, whereas, in truth and in fact, the first count was for burglary and the second for felonious assault, under the act of Assembly, charged to have been committed after the commission of the burglary charged in the first count. (3) For that the judge, in charging the jury, failed to comply with the statute (Code, sec. 413), "to state in a plain and correct manner the evidence given in the case and declare and explain the law arising therein." The prisoner excepted, and assigned as error that the court did not in charging the jury eliminate the material facts of the case, array the state of facts on both sides, and apply the principles of law to them, so that the jury might decide the case according to the credibility of the witnesses and the weight of the evidence, as required by the many decisions of the Supreme Court of North Carolina
The jury came into court, and all answered to their names, and were asked by the clerk, "Are you agreed on your verdict?" The jury answered "Yes"; and on being asked by the clerk, "Who shall say for you?" the jury answered, "Our foreman, A.H. Rhyne." The clerk then said to the prisoner, " . . . Hold up your right hand," which being done, the clerk said to the jury, "Look upon the prisoner, you that are sworn. What say you? Is he guilty of the felony and burglary whereof he stands indicted, or not guilty?" The foreman says, "Guilty!" Counsel for prisoner asked that the jury be polled, which was done, the clerk saying to each juror: "Look upon the prisoner, you that are sworn. What say you?" etc. Each juror said for himself, (895) "Guilty." The clerk said to the jury, "Hearken to your verdict as the court recordeth it. You say that Monroe Johnston is guilty of the felony and burglary whereof he stands charged. So say you all?" They said "Yes." The defendant objected to the form of the question propounded in both instances. Overruled. Exception. Motion in arrest upon the grounds: "That the bill of indictment contained two counts, charging two offenses, burglary and felonious assault, under the statute, said offenses being punishable in different degrees. The verdict of the *Page 562 
jury is a general verdict, and under decisions of the Supreme Court said verdict is null and void, and sentence cannot be pronounced. If it be contended that the verdict was limited to the first count, then it is void for inconsistency, for the defendant, under the evidence, cannot be guilty under the first count and not guilty under the second — the facts showing one whole and continuous transaction." Motion overruled, and defendant excepted. Motion for new trial overruled. Sentence of death was pronounced. Defendant appealed.
The special instructions which were asked by defendant's counsel were all given by the court. The first exception to the charge was in these words: "For that the judge failed to instruct the jury in accordance with the act of Assembly of 1889, ch. 434, p. 418, that when the crime charged in the bill of indictment is burglary in the first degree the jury may render a verdict in the second degree if they deem it proper to do so." That statute provides that "if the crime be committed in a dwelling-house or in a room used as a sleeping (896) apartment, and any person is in the actual occupation of any part of said dwelling-house or sleeping apartment at the time of the commission of said crime, it shall be burglary in the first degree." Shields, a witness for the State, testified that at the time of the burglary he and his wife and daughter were occupying rooms in the house; that he was sleeping in a room on the first floor and his wife and daughter were sleeping in a room upstairs. Upon this testimony, if the jury believed it, the defendant was guilty of burglary in the first degree. There was no proof tending to show that the burglary might have been committed under circumstances which would make it burglary in the second degree under the statute. If his Honor had charged as he was requested it would have been error. In S. v. Alston, 113 N.C. 666, the court charged the jury "that although the evidence was that the family were present in the house at the time of the commission of the crime" they might find the prisoner guilty of burglary in the first degree or guilty of burglary in the second degree. This Court held that the charge was erroneous, and said: "The court should have charged the jury that if they believed from the evidence that the family were present in the house at the time of the felonious entry, as charged, they should convict the defendant of burglary in the first degree. Under such circumstances the jury are not vested with the discretionary power to convict of burglary in the second degree." In S. v. Fleming,107 N.C. 905, the Court, in construing the act of 1889, said: "The jury are sworn to find the truth of the charge, *Page 563 
and the statute does not give them a discretion against the obligation of their oaths. The meaning of this provision evidently is to empower the jury to return a verdict of guilty of burglary in the second degree upon a trial for burglary in the first degree, if they deem it proper so to do from the evidence, and to be the truth of the matter." His (897) Honor charged the jury that there were two counts in the bill of indictment, one for the breaking and entry with the intent to commit larceny, the other with the intent to commit murder. The defendant excepted to that part of the charge because, as he alleged, the second count was not for burglary but for a felonious assault, after the commission of the burglary charged in the first count. We are of the opinion that the second count is a good one for burglary. It avers that the defendant, etc., having so burglariously as aforesaid broken and entered the said dwelling-house of the said A. C. Shields, then and there upon the said Shields, in the said dwelling-house, then and there being unlawfully, maliciously, secretly, and feloniously did make an assault with a deadly weapon, to wit, a pistol, and him the said Shields did shoot, etc., with intent him the said Shields, by the means aforesaid, then and there feloniously of his malice aforethought to kill and murder, contrary," etc. This is not the form in common use in North Carolina, but it is one approved by most of the standard writers on criminal law. The intent must usually be stated, and it must be to commit a felony; and if a felony has been actually committed in the house, the intent may be and usually is stated to have been to commit that felony. "But it seems that an indictment for burglary may in this respect be drawn in three ways: Stating the breaking and entry to be with intent to commit a felony, or stating the breaking and entry and a felony actually committed, or stating the breaking and entry with intent to commit a felony, and also stating the felony to have been actually committed. The latter is the preferable mode and that always adopted in practice, for if you fail to prove the felony committed you may still convict of the burglary, or if you fail to prove the intent, etc., you may convict of the felony." 2 Archbold Cr. Prac. Pl., 1076. And to the same effect is section 818 of 1 Wharton Criminal Law, 2 East P. Law, 2 East P. C., (898) 514; 2 Russell on Cr., 44; 1 Hale P. C., 559; Code sec. 1183.
The defendant's third exception to the charge was that his Honor failed to comply with the requirements of section 413 of The Code. We have examined carefully the charge, and we think that the testimony was orderly and plainly and correctly set forth and the law applied as the statute requires. It is a very clear charge, and quite as full as is usually given. The defendant had his case clearly and fairly committed by his Honor to the jury. We have examined each and every exception to the evidence, and they cannot be sustained. *Page 564 
The exception to the manner of polling the jury and the one to the overruling of the motion in arrest of judgment need not now be discussed, for they are of no consequence after our decision sustaining the sufficiency of the second count in the bill of indictment.
No ERROR.
(899)