DEVIN, J., concurring.
SCHENCK, J., joins in concurring opinion.
STACY, C. J., dissenting.
BARNHILL, J., dissenting.
WINBORNE, J., dissenting.
This is a criminal action. The bill of indictment by the grand jury, upon which defendant was tried, was for burglary in the first degree. The jury returned a verdict of guilty of burglary in the first degree. Judgment of the court below was death by asphyxiation.
The evidence was to the effect: That Ruth Currie and her husband, Fred L. Currie, were living in a house alone in Pembroke, N.C. facing *Page 605 
on the Lumberton-Charlotte Highway. Their nearest neighbors were Mrs. Cooke, who lived on the right, and Mr. and Mrs. Wiggins, in front and across the highway, and the Littletons.
Mrs. Ruth Currie testified, in part: "There is another lot near my home used as a place to keep second-hand automobiles; that is on the next lot to my house, adjoins my house, starts on the front and goes right on back to the woods. That lot is kept lighted at night, either three or four lights out there. It was lighted on the night, of July 28, I noticed it, the light was shining through my window." She knew the defendant, George A. Johnson. He was employed by Mrs. Cooke and was working for her two or three months. He moved her (Mrs. Currie) lawn once a week. She had a little dog named Midgett, that usually barked at night and could be heard every time he barked. The dog got friendly with defendant, as he would feed the dog "give him scraps out at night."
On the night of 28 July, she saw defendant at the Tyner Motor Company, at 9:00 o'clock, and had a conversation with him about mowing her lawn. He said, "I will do it Monday morning." She saw him again about 11 o'clock, when she was at a neighbor's house, Mrs. Robt. L. Littleton, who lived near her on the same side of the street. She was there listening to the radio. He and Willie Lee, who worked at the Tyner Motor Company, came by and stopped there and talked a few minutes and went toward her house. Mr. and Mrs. Littleton drove her home about 25 minutes to twelve. Her husband had gone to bed and she went to the living room and listened to the radio. She went to bed about 25 minutes to one o'clock. "When I turned off the light and went to my room Mr. Currie was asleep then; he and I slept in the same bed, and in the same room. I immediately went to sleep after I went to bed. I woke up, when he touched me I woke up. I was on my back and on the left-hand side of the bed, Mr. Currie on the right-hand side, and I felt something crawling on my leg, and when I did, I did like that and touched his hand, and sat up, and looked down and he was on the floor with his head down like that, and I screamed and woke Mr. Currie — I call him Judge — and he rose up and said I was having a nightmare, and when I said there is a man in the room he got up and ran. I saw him. He went toward the hall and into the kitchen. I saw him and recognized him from the light shining right in the window. The garage lot lights were shining through my window, my bed was near the window, it was between two windows in the corner of the room, and he was on the floor by the bed. After I screamed and said there is a man in the room, Mr. Currie got up, the gun was over in a chest drawer where I kept his socks and everything, and he grabbed the gun and said it was the Negro George that works for Mrs. Cooke; he ran out and went upstairs *Page 606 
and came back and went to the front of the house, and Mr. Currie goes to the telephone, and I was right behind him, and he called the city police in Pembroke, couldn't get anybody to answer, then called Lumberton and got Sheriff Wade, and he told him he would be over there immediately, and in the meantime Sheriff Wade called Carl Maynor. My husband also called Mr. Littleton and Mrs. Littleton answered the telephone, and they came immediately to my house. I told them exactly what I told Mr. Currie. I told them he was touching me and I woke up, he was going up my leg like a bug crawling on me. It was a real hot night and I had turned the sheets down at the foot of the bed; my night clothes were not down when I went to bed, I pulled it to here (indicating about half way the thing), but it was right along here when he touched me (indicating about the waist line)." . . . Several of the neighbors came and some officers. "Mr. Currie and Mr. Purcell and Mr. Littleton all went around the house. I was not with them, but I went around the house. I observed that he pushed a hole in the screen with a stick, burnt at one end, and looked like he put his hand in it; the screen fastens with a hook, and you have to pull it up and pull it off to take it off, and it was set against the wall on the outside; the stick was right on the ground, it had a charred end to it. The screen in the window nearest to the bed was unhooked and pushed out; it was unhooked so all he would have to do was jump out of the window, had the round hook pushed open and the screen pushed out; that screen was closed when I went to bed. That screen in the kitchen window that we found removed was locked; the window was pulled up but the screen was locked. Our house was locked, the screen door was locked. This happened between 3:00 and 3:30 o'clock in the morning, it was dark. We had a garbage can, it sits at the corner of the back porch and we had it buried in a hole about 18 inches deep, maybe a little bit more, and he took the garbage pail and lifted it completely up. It was gone out of that hole, it was by the window where Mr. Currie sleeps, on the side of the bed Mr. Currie sleeps, at the back window. The top was bent in where he stood up on it. The window at my head was unfastened after I went to bed and went to sleep. . . . It was the screen to the window in the kitchen that had the hole in it; it was leaning against the wall of the house; the stick was laying down on the ground. . . . I slept on the left side of the bed next to the window. The can was at the window next to Mr. Currie's side of the bed. When I observed the defendant he was there in theroom right next to the bed kneeling down, on his knees on the floor, and when I hollered he got up and ran. He ran right straight through the door. It was a moonlight night. There was missing from the home Mr. Currie'swatch, knife, pocketbook, and he had some letters, had a lot of receipts in his pocketbook. He had *Page 607 
his clothes in the chair that was next to the mantelpiece in our bedroom. . . . The next time I saw the defendant, after seeing him in my bedroom, was right here in the courtroom. He is the man I saw in my bedroom; he is theman I saw working for Mrs. Cooke; the defendant is the man I saw feed my dog, the man that promised to cut my grass on Monday morning. Q. State whether or not this defendant here is the person you saw in your house there by your bed that night? Ans.: Yes, sir." On cross-examination: "He didn't move until Mr. Currie answered me; I knocked his hand off of me when I sat up in bed and when Mr. Currie answered, he started running, he turned around just like this and ran out in the hall. . . . The defendant was perfectly normal when I saw him. I asked him when he was going to mow the lawn. I heard him talking to Willie Lee, his condition seemed to be all right. He didn't talk to me like an intoxicated man. I saw him in my home around 3:00 or 3:30 o'clock. I didn't have occasion to verify that but it was around that time. I had been asleep something like an hour or two. As to any misgivings in my mind about the identity of this man I saw in my room, there are not many colored people in Pembroke, and the minute he stood up I recognized him. . . . I am satisfied beyond even a shadow of adoubt that, notwithstanding the fact it was in the darkness, I am notmistaken; I wasn't mistaken the minute I woke up and saw him and therehasn't been a doubt in my mind from that night on. . . . (Re-direct): I told Mrs. Littleton this defendant is the man who I saw in my room, I also told Mr. Wiggins, Sheriff Wade, Mr. Purcell, Mr. Crump, Shell Warrix, and all of them when they got there. Mr. Wade or Mr. Crump picked up some struck matches, I saw them pick them up at my window and at Mr. Currie's window, I don't know whether there was any at the window where he went out or not." She was corroborated by her husband, Fred L. Currie, who testified to other facts as to how the burglar got in and out of the house. He also testified: "I didn't miss the watch not until the Sheriff brought the watch up; that must have been 5:30 or 6:00 o'clock after he arrested the Negro."
Bernice Robeson testified, in part: "When he (defendant) came back last time it was between 3:00 and 3:30 o'clock; it was after that I heard the scream and saw him running. (Cross-examination): Willie Lee and him were drinking a little bit that night, I think they were; I don't know that George was pretty drunk, he didn't act like it. . . . I don't know whether he was drunk or sober, he didn't act to me like he was drunk when he was scratching on the screen; he didn't say what he came back there for, I didn't ask him. . . . I saw him in the moonlight, the moon was shining that night. I didn't go back to sleep after he scratched on my window. It was about thirty minutes after that *Page 608 
and I heard Mrs. Currie scream. When I heard Mrs. Currie scream I saw him running from over there, he run between the garage and my house."
She was corroborated by Mrs. Robt. L. Littleton, who testified, in part: "I saw her (Mrs. Currie) again after 3:00 o'clock after a phone message was received. I saw her at her home. In consequence of the phone call we went immediately, my husband and I, up to Fred Currie's home. My husband and I got up immediately after the phone call and went there, and when we drove up in the yard — I don't imagine it took us more than five or six minutes — Mrs. Currie opened the door and was highly nervous and of course we ran in immediately, and she said, `That Negro George Johnson has been in my bedroom and touched me,' kept saying it over and over, and of course we tried to comfort her, and my husband left immediately, I don't know where he went, but I think he drove up town immediately to see if he could see any person. She described what had happened to her, she told me in detail. She said she was lying in the bed. (By the Court): Consider this, gentlemen, only for the purpose of corroborating Mrs. Currie, if you find it does corroborate her. — She was lying in the bed and was awakened by this hand on her leg and she aroused up immediately and screamed, she saw the figure of a man crouching by the side of her bed, and it wasn't until her husband answered here that he wheeled on his all fours and went out of the room, and she told me she was definite it was George Johnson. . . . I also recall seeing, when the officers were there, match stems at the window and also saw a piece of molding off a screen, also a stick, looked like he pushed in the screen, screen punched out, sharp pointed stick. I guess the piece I saw was a piece of molding, something that is on a screen, you know."
Robert Littleton testified, in part: "I went up there. The first one I saw when I got there was Mrs. Currie. I was in front and my wife behind, and she opened the front door, and she said, `He has been feeling of me,' that was exactly the words she said, and she said it over and over, she was crying very hard when we went in the room, and she told me about it. . . . I examined the windows in the house. I first looked around at the window around next to her bedroom and saw it had been opened; she told us it had been opened; we looked at it; the hook on the screen had been unfastened and the screen pushed out. On the side of the house next to Mrs. Cooke's the screen had been removed and a short stick, looked like may be a piece of broom handle, and end of it looked like it had been burned some, was laying down under where the window was, a hole was pushed through the screen right at the bottom. . . . I mean the screen was removed. I tried to see if I could get any paint off on my hands like I observed on his, and I did. It was *Page 609 
white paint. The paint I got on my hands came off of the part of the house around the window sill. I saw the garbage can, I saw the hole where it had been sitting, looked like it had been freshly moved, and moved to the back bedroom window, and the lid was caved in. I don't know whether it was caved in before, and fresh dirt on the top of it. I don't believe any matches were found where the screen had been removed, but matches were at the window at the head of Mrs. Currie on the right side, and around where the garbage can was."
Sheriff E. C. Wade, who was telephoned for, came at once. He corroborated Mrs. Currie. He went to defendant's home. "I remember the pocket of the pants this watch was in, it came out of the watch pocket on the right-hand side of his pants, front of the trousers. . . . When I left that house I came back to Mrs. Currie's and had the watch in my hand when I went in. She said, `That is Judge's watch.' I said, `Who, Mrs. Currie?' She said: `We call him Judge.' . . . I observed his condition and walked back up with them to my car. If he was drinking it wasn't enough to tell it, he might have been drinking some that night but he didn't show any signs of being drinking then, perfectly sober." Qualified by counsel for defendant on the voir dire. (The court holds that the statement, confession, was free and voluntary.) "I asked him why he went in the house, he says, `I don't know,' he said, `I was drinking I reckon or drunk.' He said he got the watch off of the mantelpiece in Mr. Currie's room."
Ralph Purcell testified, in part: "I received a message on the night of the 28th of July about ten minutes until 4:00 o'clock. In consequence of that call I went to Pembroke and went to Mr. Currie's. . . . When I got (defendant) out of the house there his trousers were wet, damp. I wouldn't be positive whether he had them on or not when I got him up. . . . He had some matches in his pocket and they were exactly like the ones we found around the window, same type matches, matches that come out of a box you strike them on, one of those square boxes. . . . (Cross-examination) I cannot say that his appearance indicated he might have been drinking the night before."
F. E. Brisson, deputy sheriff of Robeson County, after being qualified, testified, in part: "I recall when this defendant was placed in jail following his arrest. I talked with him on Tuesday after he was put in there on Sunday night. Mr. Crump was over there and he called me in the room and he told us about going in the house and getting a watch. . . . He first made the statement that he went in the house and got the watch and pocketbook and he said he lost the pocketbook going through the field, went down the highway and went through the cornfield toward Juddy Maynor's, and he said he must have lost it, and that was *Page 610 
about all the statement he made. I did not talk with him more than that one time."
Shelby Warrix testified, in part: "On the morning following this alleged crime Sunday morning I saw the defendant George Johnson, Mr. Purcell was with him. I got close enough to him to observe his condition. I smelt some whiskey on him but he wasn't under the influence then. That was around, I imagine around 6:00 o'clock in the morning. I could not tell that he had been drinking to any appreciable extent any more than I smelt some on him. I am deputy chief of police of Pembroke."
F. L. Crump testified, in part: "I am deputy sheriff of Robeson County. I saw this defendant Johnson early in the morning following his arrest around 6:30. As to his condition he seemed to be normal. I couldn't tell he had been drinking from the way he looked or acted."
The defendant testified, in part: "I know Mr. and Mrs. Fred Currie. The best I can remember, that Saturday I was down town and messed around there a little and started to drinking liquor. It was round about 9:00 o'clock, a little after 9:00, that I took the first drink; it was a right heavy drink first starting off. Me and Willie Lee and Bernice were together when I took the first drink. Bernice is the colored girl that went on the stand. She took a drink then. I took more drinks that night. We got another drink that night over at Mandy Carter's. I got hold of the package I carried to her house at 11:00 o'clock. We were leaving Mandy's house and she left ahead of us and she told me to get the shoes and I went and got the shoes. She went on ahead of me. We had got all the liquor we had before I carried the shoes to her. I reckon I had drunk about a pint. I drank liquor and beer. I disremember how much I drank. I was good and high. I remember carrying the girl's shoes to her. I remember that. I don't remember how long I stayed when I carried her shoes, I didn't stay long. I don't remember what I did after that. I went home, that is where I thought I went. I don't remember exactly which way I went when I went home. I think I went by Ernest's house and went on home. I think I did, I am not positive. I have been drunk before like that, I have been drunk lots. I have been drunk about three times and served time for it in South Carolina. I don't remember going to this house. If I did I don't remember anything about it. . . . (Cross-examination) So far as I can remember I was drunk when I left Bernice's house, that is all I know. I cannot swear what time it was. Something like 1:00 o'clock, I guess, I don't know. I don't recall going back to Bernice's house between 3:00 and 4:00 o'clock. I don't remember knocking at the window, and then on the side of the house. I don't know whether I had sense enough to leave when she told me she was going to call *Page 611 
Mrs. Cooke if I didn't leave and go home. I went home when I left there I guess. I guess I went home, when I woke up next morning I was at home. I was at home when the officers woke me up. . . . I don't remember that I went there and took a stick and punched a hole in the wire. I don't remember cutting it right where I could reach in there and unfasten the staple. I don't remember raising the screen and taking it out, and I don't remember laying it down side the house. I don't remember when I crawled in the window. I didn't see the paint in the creases of my fingers. The sheriff showed me one little streak on this finger. I played ball caused my shirt to be torn across there. Mr. Currie's house is painted white. I don't know that it is painted white around the window where the screen was taken out, I didn't pay it that much attention, all I seed was a white house. I don't remember a thing about going in his kitchen that night about 3:00 or 4:00 o'clock, or going over to the side of the bed where Mrs. Currie was. I don't know why I happened to go in the room where Mr. and Mrs. Currie were. I don't remember that I went in the room and went to the side of the bed where Mrs. Currie was sleeping. I don't remember seeing the shoes on the side of the bed where Mrs. Currie was sleeping and moving them so I could get side of the bed, so I could get close; I don't remember taking my hand and putting it on the lady. I was so drunk I wouldn't swear I did or didn't. When I woke up the next morning the cops were there. I don't know anything about putting my hand on the lady when she was in bed that night. I don't know anything about it. I was drunk and don't remember anything. I don't remember when she pushed my hand off. I don't remember anything about getting down side of the bed. I didn't hear her scream. I don't remember anything about jumping up and with my head ducked down, ran out the door. I don't remember whether I ran in the side of the wall or not. I don't remember whether I ran under the bed or upstairs. I don't remember that I ran back through the kitchen. I don't remember reaching up on the mantel and getting the man's watch, I don't remember anything about it. . . . Sheriff Wade never showed me that watch while I was in jail. I deny it because he didn't show it to me. He didn't show me any watch. . . . I didn't tell Mr. Wade that when I went in Mr. Currie's house I not only got his watch but I got his pocketbook. . . . He said, `There is but one thing you can do and that is to own it, this watch came from your house.' He asked me six or seven times. `I don't want any lying out of you to go up with the trial, you know the watch came from your home and it will really convict you.' `Nothing else to do and if you got the watch from my house, I will say the watch came from my home.' I told Mr. Crump I lost the pocketbook going through the woods. . . . I finally told *Page 612 
them I took the watch from off the mantelpiece and lost the pocketbook as I was running. I did not tell them I got the pocketbook out of the man's pants in the house. What I told them that I confessed the watch was coming from my house, they told me all about it, said Mrs. Currie said the watch was on the mantelpiece, and after I made my confession to them, they said, `George, there ain't but one thing, to plead guilty to the crime of the watch as the number compares with the one they have.' I confessed thishouse burglary between Mr. Brisson and Mr. Crump, I confessed I went in Mr.Currie's house to Mr. Crump, that is the one I told. I confessed thisburglary in the presence of this officer right here after he told me aboutit and in presence of Mr. Brisson. . . . In this crime here, breaking inMrs. Currie's house, I don't remember about them catching me. I haveadmitted it, and I didn't do it until they had caught me redhanded."
Earline Jacobs testified, in part: "George Johnson is my brother. He lives with me. We live in Pembroke. I remember him coming home on the night of July 27 of this year, Saturday night. He got home around 12:30 or 1:00 o'clock. I had been asleep. When I waked up I heard him stumbling in the room, and I said to him like this I said, `Dee is that you,' we calls him Dee, I said, `Dee, is that you, what ails you boy, why don't you go on to bed,' and about that time he said all right and I heard the bed cry when he got on it, you know how the bed do. He was high. There has been drinking in my family and with other members of my family. I drinks some. And Frank my husband and Howard Lee and a bunch of them be's drinking. I heard him stumbling around and I thought he was intoxicated."
The defendant made several exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
The first question involved, as stated by defendant: Did the court err in allowing witnesses to testify to conversations with the chief prosecuting witness in the absence of defendant? We think not. As to this question, "It is addressed to the refusal of the court to sustain defendant's objection to conversations had between Mrs. Currie and the witnesses, Littleton and Sheriff Wade, in the absence of defendant. This was hearsay testimony and if it was offered as corroborative evidence, it should have been limited to that purpose by the court and not offered as substantive evidence, as it was." *Page 613 
Rules of Practice in the Supreme Court, part of Rule 21 (213 N.C. p. 821): "When testimony is admitted, not as substantive evidence, but in corroboration or contradiction, and that fact is stated by the court when it is admitted, it will not be ground for exception that the judge fails in his charge to again instruct the jury specially upon the nature of such evidence, unless his attention is called to the matter by a prayer for instruction; nor will it be ground of exception that evidence competent forsome purposes, but not for all, is admitted generally, unless the appellantasks, at the time of its admission, that its purpose shall be restricted."
(Italics ours.)
In the corroborating testimony of Mrs. Robt. L. Littleton, the court instructed the jury: "Consider this, gentlemen, only for the purpose of corroborating Mrs. Currie, if you find it does corroborate her." The testimony of Mr. Littleton and Sheriff Wade, we think, comes under the latter part of the above rule. At least, we can see no prejudicial error. The exception and assignment of error cannot be sustained.
The defendant says in his brief: "However, defendant relies mainly upon what he contends to be the error of the court, set out in defendant's Exception 7. The jury, after deliberating for some time, returned to the courtroom and asked the court this direct question, `If we find that he was intoxicated, can we return a verdict of second degree burglary?' The court replied, `No, sir. I instructed you that you could only find the defendant guilty of burglary in the first degree, or guilty of attempt to commit burglary in the first degree, or guilty of breaking and entering otherwise than by burglarious, or guilty of an attempt to break and enter otherwise than burglariously.' The charge of the court, in response to the direct question of the jury, was tantamount to a nullification of section 4641, C. S., which says that `When the crime charged in the bill of indictment is burglary in the first degree, the jury may render a verdict of guilty of burglary in the second degree, if they deem it proper so to do.'"
We give the entire record of what took place: "After some deliberation the jury returns to the courtroom and asks for further instructions by the court. By juror: `We would like to know a little further with reference to this drunk or intoxicating phase of the law.' By the court: `What further information as a matter of law do you desire?' (By juror): `Now if he was intoxicated, what degree would he have to be intoxicated to be held responsible for his conduct?' By court: `I think I instructed you that the degree of intoxication would have to be such as would make it impossible to form a felonious intent. That is a matter for the jury. In this case the defendant has testified and offered testimony which, he contends, tends to support him, that he was drunk to such an extent that he did not know where he was or what he was doing. *Page 614 
The State, on the other hand, has offered testimony tending to show that he was absolutely sober, so that that becomes — whether he was drunk enough — becomes a question of fact for the jury. Upon that defense it is incumbent upon the defendant — he pleads that as a defense — therefore, the burden is upon him to satisfy you, not beyond a reasonable doubt, nor by the greater weight of the testimony, but merely to satisfy you, that he was so drunk that he did not have the mental capacity to form a felonious intent, in this case the intent to commit either larceny or rape, after he got on the inside of the house, if he did get on the inside of the house. That is just about as clear and definite as I know how to make it. If he were so drunk that he could not form a criminal intent, a felonious intent, then he could not be guilty.' (By juror): "If we find that he was intoxicated, can we return a verdict of second degree burglary?' (By the court): `No, sir. I instructed you that you could only find the defendant guilty of burglary in the first degree, or guilty of attempt to commit burglary in the first degree, or guilty of breaking and entering otherwise than by burglarious, or guilty of an attempt to break and enter otherwise than burglariously. There is no evidence in this case to support a verdict of second degree burglary. Second degree burglary is where the breaking and entering with intent to commit a felony, is at a time when nobody is occupying the house. It is second degree burglary for a person to break and enter a residence of any kind, in the nighttime while the house is unoccupied. All of the evidence in this case shows that particular house was occupied and, therefore, it could not be burglary in the second degree. There is not a scintilla of evidence nor contention that the house was unoccupied at the time. I do not submit it to you upon the question of second degree burglary at all. Now, does that help you any? Does that throw any further light upon it? You will just remember there arefive verdicts in this case that you may render: You may find him guilty ofburglary in the first degree, or you may find him guilty of an attempt tocommit first degree burglary, or you may find him guilty of breaking andentering otherwise than burglariously, or you may find him guilty of anattempt to break and enter otherwise than burglariously, or you may findhim not guilty.' The jury returned a verdict of guilty of burglary in the first degree against defendant George A. Johnson."
When we consider this exception and assignment of error made by defendant, we give what the court below had theretofore charged. The court charged the jury so clearly and ably the law applicable to the facts, in some 20 Pages, that defendant took no exception and assigned no error.
N.C. Code, 1939 (Michie), sec. 4232, is as follows: "There shall be two degrees in the crime of burglary as defined at the common law. *Page 615 
If the crime be committed in a dwelling-house, or in a room used as a sleeping apartment in any building, and any person is in actual occupation of any part of said dwelling-house or sleeping apartment at the time of the commission of such crime, it shall be burglary in the first degree. If such crime be committed in a dwelling-house or sleeping apartment not actually occupied by anyone at the time of the commission of the crime, or if it be committed in any house within the curtilage of a dwelling-house or in any building not a dwelling-house, but in which is a room used as a sleeping apartment and not actually occupied as such at the time of the commission of the crime, it shall be burglary in the second degree."
Section 4233: "Any person convicted, according to due course of law, of the crime of burglary in the first degree shall suffer death, and anyone so convicted of burglary in the second degree shall suffer imprisonment in the State's Prison for life, or for a term of years, in the discretion of the court."
The court charged, after stating the crime as set forth in the bill of indictment: "Burglary at the common law was the breaking and entering of the mansion house or dwelling house of another in the nighttime with the intent to commit a felony therein. That was the definition of burglary under the law of this State until the year 1889, when by legislative enactment the crime was divided into two degrees, first and second. Under our statute thus dividing burglary into two degrees, burglary in the first degree is where the crime is committed in a dwelling house or in a room used as a sleeping apartment in any building and any person is in the actual occupation of any part of said dwelling or sleeping apartment at the time of the commission of such crime. If such crime be committed in a dwelling house or sleeping apartment not actually occupied by anyone at the time of the commission of the crime, or if it be committed in any house within the curtilage of a dwelling house, or in any building, but in which a room is used as a sleeping apartment and not actually occupied as such at the time of the commission of the crime, it shall be burglary in the second degree. We have a statute in this State making it a crime to break and enter a dwelling otherwise than burglariously, and that statute reads as follows: `If any person with intent to commit a felony or other infamous crime therein shall break or enter the dwelling house of another otherwise than by a burglarious breaking, he shall be guilty of a felony.' (N.C. Code, 1939 [Michie], sec. 4235). The Supreme Court has held in a number of cases that where the evidence is sufficient to justify it upon the bill of indictment charging a defendant with burglary in the first degree, it is the duty and mandatory upon the court to submit to the jury the question of whether or not the defendant is guilty of breaking and entering *Page 616 
the dwelling house in question at the time and place mentioned in the bill of indictment otherwise than burglariously, and that it is error for the court to fail or refuse to do so. So that, under the evidence in this case, the court charges you, gentlemen, that you may render one of several verdicts according as you may find the facts to be under the law that will be given to you in the course of the charge by the court for your guidance.You may find the defendant guilty of burglary in the first degree, or notguilty; you may find the defendant guilty of an attempt to commit burglaryin the first degree, or not guilty; you may find the defendant guilty ofbreaking and entering of the residence of Mr. Currie otherwise than by aburglarious breaking and entering, or not guilty; or you may find himguilty of an attempt to break and enter otherwise than burglariously theresidence of Mr. Currie; or you may render a verdict of not guilty." In the charge the court below followed the law as laid down in this jurisdiction. He charged the law as theretofore written and reiterated in the recent case of S. v. Morris, 215 N.C. 552 (553), as follows: "The court instructed the jury that, under the evidence, only one of two verdicts might be rendered: `That is, you can find this defendant guilty of burglary in the first degree, or not guilty.' Exception. All other portions of the charge are admitted to be correct. In apt time, the defendant requested the following special; instruction: `Our law provides (C. S., 4641) that when the crime charged in the bill of indictment is burglary in the first degree, the jury may render a verdict of guilty of burglary in the second degree if they deem it proper to do so and I instruct you that you have the right to return a verdict of guilty of burglary in the second degree.' Instruction refused; exception. Verdict: `Guilty as charged.' Judgment: Death by asphyxiation. The defendant appeals, assigning errors. . . . (pp. 555-556). The only question debated on argument and in brief is whether the court committed error in refusing to submit the case to the jury on the charge of burglary in the second degree as requested by the prisoner in his prayer for special instruction. The authorities answer in the negative. S.v. Spain, 201 N.C. 571, 160 S.E. 825; S. v. Ratcliff, 199 N.C. 9,153 S.E. 605. It is provided by C. S., 4641, that upon an indictment for burglary in the first degree, the jury may render a verdict of burglary in the second degree `if they deem it proper so to do.' But this, according to our previous decisions, does not, as a matter of law, authorized the trial court to instruct the jury that such a verdict may be rendered independently of all the evidence. S. v. Johnston, 119 N.C. 883,26 S.E. 163; S. v. Alston, 113 N.C. 666, 18 S.E. 692; S. v. Fleming,107 N.C. 905, 12 S.E. 131. It has been said, however, that in such a case, a verdict of burglary in the second degree, if returned by the jury, would be permitted to stand, notwithstanding *Page 617 
evidence of occupancy of the dwelling house at the time of the alleged offense. S. v. Smith, 201 N.C. 494, 160 S.E. 577. And this upon the principle that the verdict, being favorable to the prisoner may not, for this reason, be successfully challenged by him. S. v. Alston, supra. Here, all the evidence establishes the actual occupation of the dwelling house at the time of the offense. S. v. McKnight, 111 N.C. 690, 16 S.E. 319. This precluded the court from submitting the case to the jury on the charge of burglary in the second degree as defined by C. S., 4332. S. v. Spain,supra, and cases there cited. Speaking to the question in S. v. Ratcliff,supra, it was said: `There is no evidence on the present record of burglary in the second degree as defined by C. S., 4232, unless the jury disbelieve the evidence relating to occupancy. S. v. Alston, 113 N.C. 666,18 S.E. 692. All the evidence tends to show that the dwelling house was actually occupied at the time of the alleged offense. Hence, under these conditions, according to our previous decisions, an instruction that the jury may render a verdict of burglary in the second degree, "if they deem it proper to do so" (C. S., 4641), would be erroneous, though a verdict of burglary in the second degree, if returned by the jury, would be permitted to stand, such a verdict, under the circumstances, being regarded as favorable to the prisoner.S. v. Fleming, supra; S. v. Alston, supra. This may seem somewhat illogical, in view of C. S., 4640 and 4641, nevertheless it is firmly established by a number of decisions.'" We think this case is authority for the additional charge after the jurors' request, and the exception and assignment of error made by defendant cannot be sustained. The Morris case, supra, is approved in all particulars in the last case on the subject. S. v. Chambers, ante, 442, filed 7 November, 1940.
The court below correctly charged the jury as to the rights of defendant to satisfy the jury "that at that time he was too drunk, too deeply under the influence of intoxicants, to make it possible to form a felonious intent to commit a felony therein, it would be your duty to render a verdict of not guilty of burglary in the first degree," etc. The court had theretofore in the charge followed the decisions of this Court when drunkenness was a defense for crime. This, and no other part of the charge, was excepted to. The evidence, direct and circumstantial, which we fully set out, is overwhelming that defendant committed the crime. He himself said: "In this crime here, breaking in Mrs. Currie's house, I don't remember about them catching me. I have admitted it, and I didn't do it until after they had caught me redhanded."
It appears from the record that defendant's sole defense was based on drunkenness. He had the benefit of a clear and correct charge on that aspect. The evidence disclosed that defendant had a fair and impartial *Page 618 
trial from a judge who carefully followed the decisions of this Court on every aspect of the case and applied the law applicable to the facts.
The law as stated in this opinion has been the well-settled law in this State since S. v. Fleming, 107 N.C. 905 (1890) — for half a century — and has been followed ever since in numerous decisions, with no modification or equivocation by any member of this Court. Public Laws of 1889, ch. 434, was construed in that opinion. At p. 909, in a unanimous opinion of the Court, it was written: "We do not understand the provisions of the statute that, on an indictment for burglary in the first degree, the jury can return a verdict of burglary in the second degree; `if they deem it proper so to do,' to make such verdict independent of all evidence. The jury are sworn to find the truth of the charge, and the statute does not give them a discretion against the obligation of their oaths. The meaning of this provision evidently is to empower the jury to return a verdict of guilty of burglary in the second degree upon a trial for burglary in the first degree, if they deem it proper so to do from the evidence, and to be the truth of the matter."
The defendant admitted that he was caught "redhanded," breaking and entering a home after midnight and attempting to commit rape and did commit larceny. The State's evidence was to the effect that he was "perfectly sober" and his actions indicated it. In the breaking and entering he showed intelligent care in the manner of his approach.
For the reasons given, we find
No error.